**BUFFINGTON & SULLIVAN, a partnership, composed of S. J. Buffington and Neal A. Sullivan, Plaintiff in Error,**

v.

**BIRDWELL, a division of Seismograph Service Corporation, a Corporation, Defendant in Error.**

No. 39967.

Supreme Court of Oklahoma.

Sept. 30, 1964.

Raymond A. Trapp, Ponca City, Neal A. Sullivan, Newkirk, for plaintiff in error.

Cox & Buhrman, Blackwell, Joseph L. Hull, Jr., Tulsa, for defendant in error.

BLACKBIRD, Chief Justice.

This case arose out of efforts to make a well, drilled· by plaintiff in error in, a certain area in Okmulgee County, ·produce oil by use of a particular method; process, or treatment, commonly known in the oil industry as "sand fracking". The ren- ·dering of this treatment, or service, to 'oil operators is at least a part of the business in which defendant in error has been engaged.

At the inception of this controversy, and for some time previous thereto, plaintiff in error, hereinafter referred to as defendant, had drilled several wells in the area before commencing the one involved herein, known as the "White 1–A". Upon orders obtained for it by its salesman, to whom we will refer as "Mr. B", defendant in error, hereinafter referred to as plaintiff, had sand fracked some of those wells for defendant by the so-called "bullet" method. That was the only method that had ever been used on any of defendant's wells before the White 1–A was drilled. This method differs from a newer one known as "jet" sand fracking.

It appears from uncontradicted ˙allegations and evidence, that in the White 1–A well, defendant encountered two of the area's sands that are often productive, namely, the "Sonora", and the "Bartlesville", or "Salt" sands, at respective depths of 520 and approximately 1000 feet. After "running" a total of 1022 feet of 7-inch pipe, or casing, into the well, ·defendant

drilled it to a total depth of more than 1600 feet, where the Dutcher Sand was encountered and cored. Oil, which appeared in the bailer when it was used to clean out the well at this point, indicated the presence of oil in that sand, but, as defendant decided to test the two above-named upper sands—the Sonora and the Salt—its Mr. Buffington contacted plaintiff's salesman, the above mentioned Mr. B, to engage the plaintiff company to do the sand fracking on them. At the close of their conversation, it was agreed that jet sand fracking would be used on the well. The results of the sand fracking were negative, and when, after Mr. Buffington no longer had an interest in the well and the other member of the defendant partnership, Mr. Sullivan, had taken it over, a pump was installed on the well and attempts made with it to produce from the Dutcher Sand, the well failed to produce in paying quantities.

When plaintiff attempted to collect the sum of $648.00 in payment for its services, and the materials, used in the sand fracking, defendant refused to pay; and plaintiff thereafter instituted the present action to recover said sum from defendant.

The brief gist of defendant's answer to plaintiff's petition was that its ordering of the well's sand fracking by the jet method had been induced by fraud on the part of the plaintiff in failing to inform it that said method had, on many occasions, been unsuccessful when used on the Salt Sand; that had it not been for this omission, and its reliance on plaintiff's representations, defendant would have had the well sand fracked only by the bullet method; that as a result of the well's sand fracking and plaintiff's fraud and negligence, the sand fracking treatment went into the open hole, dropping to the Dutcher Sand below, and destroying the productiveness of that sand. In the cross petition connected with defendant's answer, it alleged that, as a result of plaintiff's fraud and negligence, the 7-inch casing in the well, of a value of $1409.69, was a total loss; defendant lost the benefit of the well's cementing in the amount of its value, $152.39, and of the value of sand fracking treatment in the sum of $1258.68. Defendant further alleged that also as a result of plaintiff's fraud and negligence, the Dutcher Sand in the well "was fractured into the production of water", and defendant lost the value of the drilling of the hole, in the amount of $3200.00. On the basis of the allegations in its answer, defendant prayed, in its cross petition for judgment against plaintiff totalling the sum of the above mentioned items, or $6020.75, and its costs.

After the issues had been joined by plaintiff's filing of a reply, and answer to defendant's cross petition, the case proceeded to trial before a jury.

At the close of the evidence introduced in support of defendant's cross petition, the court sustained a demurrer to it interposed by plaintiff. At the close of the trial, the court directed a verdict in plaintiff's favor for the $684.00 it sought, and thereafter rendered judgment accordingly. After the overruling of its motion for a new trial, defendant perfected the present appeal.

Under the single proposition advanced for reversal of the trial court's judgment, defendant attempts to show that, on the basis of the evidence pertaining to the allegations of its answer and cross petition, the court erred in its ruling on the above mentioned demurrer and motion for a directed verdict. During oral remarks made by the trial judge in ruling upon said demurrer, he expressed the opinion that defendant had not discharged its burden of proof. We have carefully examined the evidence and concluded that he was correct.

Although the evidence tends to show that the jet method of sand fracking has sometimes been unsuccessful when used on the Salt or Bartlesville Sand, and that some of those experienced in such matters do not recommend it for use on such sand, the

evidence in the present case does not demonstrate that conditions in the particular well involved here were such that either the jet method, or the bullet method (which latter defendant had previously used) would have been successful, or that the use of the jet method on said well, in or of itself, was the cause of plaintiff's alleged damages. In our opinion, the evidence in this case shows the truth—at least as applied to this well—of the reason printed on the plaintiff's work order sheets (introduced in evidence) for its inability to guarantee its work as follows: "* * * there are too many conditions in and around wells which are uncertain and unknown and not subject to our control, * * *".

The only evidence in the record as to how the sand fracking material and solution came into contact with the Dutcher Sand tended to show that it penetrated the cement around the 7-inch casing in the well and found its way into the lower, open, or uncased part of the well below the plug in the casing, to the bottom of the hole, where the Dutcher Sand lay. Although there was testimony to the effect that when the jet method of sand fracking is used on a sand, it penetrates it farther than does the bullet method, there was other testimony to the effect that the damage to, or penetration of, the cement behind the pipe in a well becomes more likely the larger number of perforations that are made in the casing so that there is "communication" by the sand fracking material from one hole to the other. There was no evidence that there was an excessive number of perforations made in the sand just in accomplishing the jet sand fracking process that was used. There was testimony to the effect, however, that the number of these perforations was increased by refracking the well with the bullet process, soon after the jet process was discontinued without any ascertained accomplishment. Defendant neither alleged, nor now contends, that plaintiff was responsible for the decision to do the bullet refracking job immediately "on the heels", so to speak, of the jet job.

Furthermore, there was other evidence which tended to show that the failure of the jet sand fracking process to obtain beneficial results was the fault—not of that part of the operation—but of the character of the cementing which was done by another contractor, the Halliburton Oil Well Cementing Company. That defendant anticipated that the sand fracking of the upper sands might bring water to the lower, or Dutcher, Sand, is shown by the testimony of Mr. Buffington, who was present at the well when the work was done. He testified, in substance, that to keep the water from penetrating the Dutcher, he had Halliburton run a "few feet" of a quick-setting cement, called "calcia", into the casing, on top of the plug. He further testified:

"Q Well, now, in this case then when you did discover the water and sand below the plug up there, it still was sealed off from the Dutcher sand, so it served its purpose?

"A Well, apparently it didn't, because when we kept swabbing the Dutcher and testing it, why, we had water then afterwards where we never had any water before.

"Q Then you would say this was—that the cementing job didn't do its job?

"A No, I would say the calcia didn't shut the water off from the lower formation."

Witness Earl Gressett, who testified that he is the "Field man over * * * fracturing" for Halliburton Cementing Company, in describing the attempt to recover production from the jet fracking that was done, testified, in part as follows:

"Q When you applied 2500 pounds pressure before the bullet perforation after the jet, what was the reason, what would be normal reason and the one usually surmised at that time as to why this didn't fracture upon this?

"A I think it was because probably *the cement penetrated the formation further* than the perforations, would be the only reason I would know.

"Q In other words, *the cementing* around the casing had *penetrated the formation to a depth beyond that which the jet charge penetrated.*

"A Yes.

"Q Is this a frequent occurrence?

"A Yes, sir.

"Q Would a bullet perforation have penetrated any deeper?

"A I don't know.

"Q Well, normally a jet, as I understand, the advantage of jet perforation is that it has a deeper penetration?

"A (Witness nods).

"Q So you would naturally expect that a bullet would not have penetrated that far?

"A That's right."

In view of the evidence in this case, there is insufficient basis for concluding that, as to the particular well involved herein, the bullet method of sand fracking, if it had initially and singly been used would have been any more effective in obtaining production from the Salt, or Bartlesville, Sand than the jet method. And, if the jury had concluded, upon submission of the case to them, that the combined use of the two methods was the cause of the Dutcher Sand afterward producing thirty-five barrels of water to only one barrel of oil per day (as Mr. Sullivan testified), there is no evidence from which it could have concluded that plaintiff was responsible for such use of two methods, rather than only the first, or jet, method. In this connection, see Gillette Motor Transport v. Kirby, 208 Okl. 68, 253 P.2d 139 (Syll. 2) and Gedra v. Dallmer Co., 153 Ohio St. 258, 91 N.E.2d 256, 17 A.L.R.2d 453 (syll. 3).

As we have concluded that the evidence was insufficient to go to the jury on defendant's allegations of fraud and negligence, we must hold that the trial court committed no error in sustaining defendant's demurrer to it, and directing the verdict in plaintiff's favor. The judgment of that court is therefore affirmed.

HALLEY, V. C. J., and DAVISON, JOHNSON, WILLIAMS, JACKSON, IRWIN and BERRY, JJ., concur.